IN THE

# SUPREME COURT

OF

# MINNESOTA.

―――――◄●►―――――

## OCTOBER TERM, 1872.

―――――◄●►―――――

CHARLES F. DAVIS, *et al.*

*vs.*

RICHARD J. MENDENHALL, Garnishee of Theodore B. Spratt.

The sufficiency of the evidence in the case to sustain the referee's findings of fact, considered and determined.

S was driving logs, which he had agreed with M to cut, haul and drive for him into the outlet of Gull Lake. S's foreman had the logs in his charge, and was driving them with the help of workmen employed by S. Their wages being in arrear, and it being apprehended that they would detain the logs and not let them out of the lake, M, with the assent of S, promised them that, if they would not detain them, he would pay them. on account of said wages, what he owed S on said agreement. *Held* that

Davis et al. v. Mendenhall.

the logs were in possession of S, by his foreman, and not in the possession of the men within the meaning of *Gen. Stat. ch.* 90, *s.* 16, allowing one who bestows labor upon an article, at the request of the owner or legal possessor, to "hold and retain" possession thereof until his charges therefor are paid. That as any such detention of the logs would have been illegal, forbearance therefrom would be no consideration for the promise of M aforesaid.

An agreement between M and the men, that if they would not quit the work, but keep on till the logs reached the outlet, M would pay them as aforesaid, what he owed S, could not bind M's indebtedness to S, and render it no longer liable to garnishment at the suit of his creditors, without S's assent thereto, given prior to the service of the garnishee process on M.

It seems that the payment by M to S, after service, of $217 for work done before the service of the process, is competent evidence to show that he owed him that sum at the time of such service. If otherwise, the same fact being found by the referee on other and independent testimony, the error in admitting such evidence is immaterial.

A witness for garnishee stated, on cross-examination, certain matters of hearsay evidence, not in response to any question of plaintiff, but of his own accord. *Held*, to be no objection to a motion by plaintiff to strike it out, that the evidence was admitted without objection.

A creditor of S garnisheed certain personal property in M's possession and under his control, as the property of S. *Held*, that the creditor may prove in this suit, without alleging it by supplemental complaint under *Gen. Stat. ch.* 66, *s.* 158, and proceeding as therein required, that a bill of sale of said property, given by S to his said foreman, was not meant to operate, and did not operate as a sale, but was merely given as a cover against creditors.

The plaintiffs, Charles F. Davis and Lewis Clark, partners as Davis & Clark, brought suit against Spratt in the district court for Stearns county, to recover for goods sold and delivered to him, and summoned Mendenhall as garnishee. The garnishee summons was duly served on the garnishee on the 26th May, 1871. Upon his examination the garnishee denied that he was in any manner indebted to Spratt, or that he had property or effects in his hands or under his control belonging to Spratt,

at the time of the service of the garnishee summons.   Thereupon the plaintiffs, by leave of the court, filed and served a supplemental complaint, making the garnishee a party to the action.   The supplemental complaint alleges that, at the time of the service of the garnishee summons, " the said Mendenhall had in his possession and under his control, belonging to said Spratt four working oxen," with yokes, chains, sleds, &c., " in all of the value of $600, the same being the outfit of a lumbering party of 12 or 15 men; and that on said day the said Mendenhall owed and was indebted to said defendant Spratt, by virtue of certain work and labor done and performed for him by said Spratt, in the full sum of $610."   Judgment is demanded against the garnishee for the amount of Spratt's indebtedness to the plaintiffs, as stated in the complaint. Spratt made no appearance in the action and judgment was rendered against him by default.   Mendenhall, the garnishee, answered denying the allegations of the supplemental complaint, and the issue thus formed was, by stipulation, tried by a referee, who reported the following findings of fact:

" That on the 12th day of September, 1870, the defendant Spratt and the garnishee Mendenhall entered into a written agreement for the cutting of logs on certain lands therein described, and for banking and driving the same into the limits of the Mississippi and Rum river boom at an agreed price of $4.50 per M.; that under and by virtue of said agreement, defendant Spratt cut and banked about 600,000 feet, and also, during the same period of time, cut and banked for said garnishee Mendenhall about 588,000 feet of logs cut from government and railroad lands.   All these logs were marked with Mendenhall's recorded mark, as the same is described in said written contract, and, at the time of the serving of the garnishee summons herein on the garnishee, were in the Gull river, between the outlet of Gull lake and the Mississippi

river, and were intermingled and undistinguishable. That they were then being driven to the boom aforesaid for 75 cents per M, under an agreement made by and between Spratt, Mendenhall and one Bassett. That the crew working for Spratt in getting these logs had filed no lien as required by law, nor had a lien accrued thereon, nor had the garnishee, Mendenhall, made any promises to said crew up to the time of the service of the garnishee summons, which would render him legally responsible to the men for their wages, or any part of the same. That the logs cut on government and railroad lands were worth at the date of the garnishee summons $8.50 per M, in all $4,948, less $600 subsequently paid for stumpage, and $441.50 for driving the same; and that the work and labor performed for Mendenhall by Spratt upon the logs so cut on government and railroad lands prior to said 26th day of May, 1871, were reasonably worth $3.75 per thousand feet, in all amounting to $2,205.

" That Mendenhall had, on said 26th of May, paid to Spratt the sum of $3,370, and that the four head of oxen, bought by Spratt for $445, with money advanced for that purpose under said contract, still remained the property of the said garnishee, and were on said day in his possession and under his control. That subsequent to the service of the garnishee summons herein, the garnishee Mendenhall paid to the men comprising the crew getting out all of these logs, 40 cents on the dollar of their claims against Spratt, in all the sum of $638; and that in the months of June and July, 1871, he paid to the defendant Spratt, for and on account of the logs cut under the contract between them, and those cut on government and railroad lands as aforesaid, the sum of $217; and that said logs and all of them were in July, 1871, within the limits of the boom mentioned in said contract, and were afterwards sold by said garnishee Mendenhall for $8.50 per M."

As conclusions of law, the referee found: 1. "That at the

Davis et al. v. Mendenhall.

date of the service of the garnishee summons herein, on May 26th, 1871, the garnishee Mendenhall was indebted to the defendant Spratt in the sum of $1,085.    2. That the payment of $638 of this sum to the crew by the garnishee, subsequent to the service of the garnishee summons on him, was a voluntary payment by him of the debt of defendant Spratt, made without legal obligation, no lien having been filed by the crew, as required by law, and they having no lien whatever on the logs at the time of the payment.    3. That the $217, paid by the garnishee to the defendant Spratt after said service of the garnishee summons, was a part of said sum of $1,085, owing by the garnishee to the defendant Spratt at the time said summons was served.    That plaintiffs are entitled to judgment against the garnishee for said sum of $1,085, with interest from May 26, 1871, or so much thereof as may be necessary to pay in full the judgment named in this action by the plaintiffs against the defendant, and costs."

Judgment was entered accordingly, and garnishee appeals.

All other matters necessary to a full understanding of the grounds upon which the case is decided, are stated in the opinion.

EDWARD O. HAMLIN, for Appellant.

KERR & COLLINS, for Respondents.

*By the Court.*—RIPLEY, CH. J.—The 688,000 feet of logs cut on government and railroad land not having been cut under the written agreement or at an agreed price, Mendenhall at the time of the service of the garnishee summons was liable to Spratt for the reasonable value of his services performed thereabout to that date.

The logs had then been cut, hauled and driven by Spratt

into the outlet of Gull lake, where Bassett had taken them in charge. The referee finds that these services were reasonably worth $2,205; i. e., $3.75 per M. On this point Spratt says: " All the way I could get at it would be to say that it was worth what I got, $4.50 per M. less the amount for driving from mouth of Gull lake to the boom;" evidently referring to the price for which Bassett had agreed so to drive all the logs, viz.: 75 cents per M. On his cross-examination he states that " no man could have afforded to take his men from below, and go up there and drive them at that price. I would not have undertaken to go from below and drive them for less than twice that."

He was then asked by the appellant: " In making log contracts, what is the amount ordinarily reserved as payment for the drive on the Mississippi river from the mouth of Gull lake to the boom ?" This was objected to as immaterial, but the objection was overruled. The answer, "Usually I should think it worth a dollar and a half," was not responsive to the question ; but the evidence is competent upon the question as to what it would be reasonably worth to perform such a service. But that is not the question. It might very well be that to cut, bank and drive these logs into Gull lake would be reasonably worth $3,75 per M. as Spratt says it was, notwithstanding that it would be usually reasonably worth $1.50 per M to drive logs to St. Anthony.

Spratt, in effect, says, "I got $3.75 per M in this instance, and think the work was worth that ;" and it appears that Mendenhall, in his interviews with one of the plaintiffs, estimated the value of the work done by Spratt upon all the logs at $4.50 per M, less the sum paid, or agreed to be paid for driving. That, he said, was his book account and he estimated his indebtedness to Spratt upon that basis.

If he had any other reason for such estimates in respect

of these logs not cut under the written agreement, than because Spratt's work was worth that sum, he could have made that appear.

Certainly it cannot be said that there is no evidence reasonably tending to establish the fact that Spratt's services were worth that sum.    11 *Minn.* 341.

As to the 600,000 feet cut under the contract, it is said that all but $2.50 per M was contingent; that 50 cents per M depended upon the contingency of these logs being driven from Gull lake into the Mississippi, and $1.50 upon the contingency of their being driven into the boom.

How the case would have stood under the written contract, it is not necessary to consider.   The written contract was that Spratt, in the spring of 1871, would drive the logs through the outlet of the lake into the Mississippi, and down the river into the boom, making a clean drive and using all proper care usually taken by prudent men in that business for the safety of said logs.   But about April it was agreed by and between Spratt, Bassett and Mendenhall, that Bassett should drive them down the river for 75 cents per M, to be paid him by Mendenhall.   Mendenhall took Bassett for that in the place of Spratt.   The sum to be paid to Bassett for the drive was then set apart.   Mendenhall's indebtedness therefore to Bassett might or not be contingent on the safe arrival of the logs.   What the bargain was as to that does not appear ; but most certainly his indebtedness to Spratt for his work and labor was in no manner contingent upon Bassett's performance of *his* agreement.   And accordingly Mendenhall thereafter and before Bassett had taken charge of the logs, states himself, as above mentioned, to be indebted to Spratt at the rate of $4.50 per M. for *all* the logs, less this 75 cents to be paid Bassett.

There seems to be no reason to question the statement of

the plaintiffs that the figures on the back of Exhibit " C " were made about May 24th, by Davis, as given him by Mendenhall; and it appears therefrom that the work done by Spratt on all the logs came, according to Mendenhall, to $4,410. He states, according to Davis, and also testifies that he had at that time paid Spratt $3,800, leaving $610 due Spratt; but the referee has found that Mendenhall had paid to Spratt but $3,370.

By the contract Mendenhall was to purchase and furnish to Spratt a team of oxen at a cost of about $450, to be used in hauling said logs, the title to the team, however, to be and remain in Mendenhall till he should choose to transfer it to Spratt, but he to have the right to turn it over at any time at its cost in payment for cutting, hauling and driving said logs. Mendenhall says that about April 18th, Spratt and he had a settlement; that Spratt wanted him to put down on the contract all he had paid him up to that time; that the endorsement, put in evidence on the contract, made at his request, included everything he had paid him, $3,815. " It includes the cattle bought of Row & Wilson, amounting to $445, I believe. These were the cattle I purchased under the agreement, and which I had charged up to him."

The referee, on the other hand, finds that the four head of cattle, bought by Spratt for $445, with money advanced for that purpose under said contract, still remained the property of Mendenhall. Whether Spratt or Mendenhall purchased the cattle is of no consequence. It is plain that they were purchased with money furnished by the latter under the contract, and remained on May 24th his property, unless he had previously turned them over to Spratt in part payment as aforesaid.

The appellant contends that Mendenhall's evidence fully proves that they had been so turned over; that the charge

Davis et al. v. Mendenhall.

was made by Mendenhall, known to and acquiesced in by Spratt; that the cattle were in his possession, and thereafter were treated by both as Spratt's, and had therefore become his.

We think, however, that there is evidence in the case which has a reasonable tendency to sustain the finding of the referee 11 *Minn.* 341; 16 *Minn.* 64.

Spratt testifies that the " four head of cattle were the same mentioned in the agreement. The whole property (*i. e.* the oxen and outfit) was Mendenhall's. I gave him a bill of sale for them in the fall. The cattle were never formally turned over to me. There was no other consideration for the bill of sale in the fall except this agreement." On cross-examination he stated that the bill of sale did not include the cattle.

The appellant says that no formal turning over was necessary; but still, if Mendenhall's testimony tends to show that he had turned them over to Spratt in payment, Spratt's testimony, that they were Mendenhall's, directly conflicts with such a conclusion.

As to the appellant's suggestion, that Spratt after said settlement treated the cattle as his own, Spratt says : " I left my camp, oxen and two chains, when I left, with Truman Morse at the agency. The rest of my stuff was in Gull lake, afloat on a raft. I gave all that property to Jas. Rush. Gave him a bill of sale of four oxen and all the rest of the traps, in May, about the middle ; might not have been so late as the middle." "I had the outfit in my possession, and the bill of sale was for Rush to go and get it." " I told him, (Mendenhall,) what I had done with the oxen, outfit and logs. This was about May 15, perhaps later. Don't recollect his reply. I wanted to sell the property, oxen and outfit in June. Had a talk with Mendenhall about that." " I think Mendenhall said he didn't care what became of the team and outfit. He wanted it sold to the best advantage." " Mendenhall told me did not care about

the property, except to dispose of it to the best advantage. I owed Rush about $600, and he took all the property." "I got $75 of Rush, besides his indebtedness, when he took the cattle away from Minneapolis."

The giving of the bill of sale to Rush for whatever purpose was an assumption of ownership; but it is pretty clear that Spratt did not consider himself at liberty to sell the property, oxen or outfit, without Mendenhall's permission, and did not consider that the giving the bill of sale to Rush was a sale.

As to Mendenhall, on the other hand, it is to be noticed that he leaves the fact, that he turned over these cattle to Spratt in part payment on the 18th April, *to be inferred.*

When, or for what purpose the price of the cattle had been "charged up" by him to Spratt, does not appear. The price of cattle purchased under the agreement might have been charged at the time of purchase to Spratt's account, yet not "turned over."

Nor does it appear when the endorsement, "I have allowed Spratt to trade one pair of cattle for a heavier pair, red one with white face, in Wright county, (signed) R. J. Mendenhall," was made.

If made at the time of the "statement," that fact would be evidence going to show, that the parties did not *then* understand that Mendenhall had "turned over" the cattle to Spratt in payment of $445.

Further, it is difficult to understand upon what theory Mendenhall could properly assume to send for the oxen and outfit, except that, under his purchase of the oxen and the bill of sale to him of the outfit, he had the legal title

Again, Davis testifies that he "asked to know how much he was owing Spratt. He took his books, figured out the amount, and I took it down. He made $610, book account, due Spratt, and six oxen and outfit. He said he had the control of six

oxen and outfit, worth $500, belonging to Spratt." Davis' statement not being denied, it may be taken as true.

It appears that Davis returned home on the 24th May Dougherty states that he got the property the day before he left Crow Wing. It appears that he left either on the 25th or 26th May. Rush turned the property over to him at Crow Wing, and he then telegraphed to Mendenhall that he had got it. At the very earliest Mendenhall could have had no knowledge of Dougherty's success before some time on the 24th ; and while Dougherty got four oxen, Mendenhall said he had the control of six.

From these circumstances the inference is exceedingly strong, to say the least, that Mendenhall's statements aforesaid to Davis were made before he got Dougherty's telegram.

In that case, since he had a bill of sale of the outfit, he might have truthfully said that he had the control of that ; but the four oxen aforesaid were certainly included in the six oxen mentioned by him, and as to those four oxen he could *not* have truthfully said he had the control of them, if he had turned them over to Spratt. It is noticeable in this connection that the outfit, of which he had a bill of sale, he states to be *due* Spratt, as well as the oxen.

Davis further states that Mendenhall made out from his books that there was due $1,110 after deducting the $900, (for Bassett) and including the $500 for oxen and outfit. That sum is made up on the back of exhibit C, by adding to $610, " six oxen and outfit $500."

Certainly it may be reasonably concluded from this testimony and these circumstances that, in respect of these oxen, Mendenhall considered himself as indebted to Spratt in a further sum than the balance of his book account aforesaid.

The referee was the judge of the weight to be given to the testimony of the witnesses respectively, and the settled rule of

the court forbids an interference with his decision upon this question of the ownership of these oxen, although upon the evidence we might have come to a different conclusion. It may also be remarked that, for any obscurity upon this point, Mendenhall, who had it in his power to make it perfectly plain, must take his full share of responsibility. Upon this basis the referee finds that there was $1,085 due Spratt on the 26th May.

The appellant contends that he is entitled to deduct from this the amount paid in June to Spratt's men, and that, in fact, he is entitled to retain for them all that was due them, having, as he says, promised to pay them before he was summoned.

If he owed it to them before, he had a right to pay it to them after this process was served. We think, however, that leaving the statute of frauds out of the case, no such indebtedness is proved.

It is perfectly evident that Mendenhall did not mean to promise, nor is it shown that he did promise to do more than to pay to the men, instead of to Spratt, what he owed to the latter.

His own testimony is, that " I sent word by Dougherty to the men, that if they would stick by the logs, I would pay them what was due Spratt, and would pay him no more."

Dougherty says he " told the men what Mendenhall told me, and they were perfectly satisfied when they heard what Mendenhall said."

Dougherty, indeed, also states that Mendenhall told him " to tell the crew if they would stick to their work and drive the logs, they would get their pay," " the idea Mendenhall conveyed was, they would get their pay."

But, in respect to any difference between Mendenhall and his witness on this point, it is to be observed that the latter's detailed statement of what took place between them makes

Davis et al. v. Mendenhall.

it quite clear that Mendenhall states correctly the message he sent.

Mendenhall said "he did not know whether there would be enough to pay 40 cents on the dollar. This was on the 11th May, 1871. He said if the crew could get the cattle and kit of Spratt, there would be enough to pay the crew. There were seven oxen there, and kit, and he wanted me to go and get it for the benefit of the crew. * * We talked about Spratt's indebtedness. Davis and Clark's order for something over $600 was among the bills that Mendenhall said were against Spratt. He said he did not calculate to pay it—would not accept it. He said he would return it after I had got the property in my hands up river. Mendenhall said he would not accept the Davis & Clark order, because he wanted to pay the men."

If Mendenhall's promise was, as we think it was, to pay to the men instead of to Spratt that which he owed Spratt, it is also to be observed, in that case, that such promise would not affect his indebtedness to Spratt without Spratt's assent thereto.

The appellant contends that such assent is proved by referring to the following testimony of Spratt: "I received a telegraphic dispatch from Mendenhall saying that, if the men undertook to detain the logs they would not get a cent; but if they let them out, he would pay them what was due me. I gave the dispatch to Rush, the foreman, to carry to the men. He took it. Don't know if he took it to the men. I suppose they were let out. I saw some of them below."

This, if it proves Spratt's assent to anything, it is to an undertaking to pay the men what Mendenhall owed him, if they would not detain the logs. We think there is no doubt but that this was Mendenhall's real anxiety, and the

object he wished to secure. He says, for instance, in his argument in this court, "the men who had cut and hauled and driven these logs, and in whose actual possession they were, were threatening to detain them, and not turn them out of Gull river, until the payment of their wages was secured. Spratt had left; it was of the utmost consequence to Mendenhall that the men should stick to the work and get the logs out into the Mississippi river, so as to be driven by Bassett, and Mendenhall's promise arose out of these new and original considerations of benefit between these newly contracting parties, viz.: Mendenhall and the men."

The men, however, had no right to detain the logs. There is no proof and no pretence that they had taken any steps to secure a lien on the logs under *Gen. Stat., ch. 32, title 6.*

The appellant's contention that they had a lien under *Gen. Stat., ch. 90, sec. 16,* is untenable. As matter of fact, the men were not in possession of the logs within the meaning of that statute. They were in Spratt's possession, by Rush his foreman. Spratt says that when he left, he left them in his charge. Dougherty says that Rush turned them over to Bassett. "When Dougherty reached the lake the logs were coming into the mouth of Gull river; Rush was driving them. They were turned over to Bassett's men the next day."

Assuming, then, that it was in consequence of Mendenhall's promise aforesaid that the men refrained from detaining the logs, such detention would have been altogether illegal. Forbearance therefrom would have been no consideration for such promise.

We are unable to discover the evidence of a contract, made between Dougherty for Mendenhall and the men, that, in consideration of Mendenhall's undertaking, they would not stop work, but would go on and get the logs out so as to be driven by Bassett.

Davis et al. v. Mendenhall.

The men were then engaged upon the last day's work which Spratt had to do for Mendenhall. They were certainly at work for Spratt under a contract with him. There is no ground whatever to suppose that, if Dougherty had not arrived, the men would not have finished their day's work. If there had been camp talk about detaining the logs before Dougherty went down to look " after his wages," the idea, (whether due to the telegram or not,) had been given up. It was the kit which they then wished to detain, a wish not unreasonable under the circumstances. But of any design not to finish that day's work, the case furnishes no ground for a suspicion.

But suppose that there was a bargain between Mendenhall, by Dougherty, and the men, not to then quit work, but keep on till all the logs reached the mouth of Gull river—that could not bind Mendenhall's indebtedness to Spratt, or render it no longer liable to be attached by this process, unless Spratt agreed to it.

No doubt it would be desirable for Spratt, as well as Mendenhall, that they should not then quit work; but how does it appear that he had agreed that Mendenhall might apply what was due him in payment of the men, provided they would not quit work—in other words, if they would not break their contract with him.

There is no proof that he ever even knew of Dougherty's mission, and much less that he assented thereto.

As, therefore, it does not appear that, at the time of the service of the garnishee summons, Mendenhall had become indebted to the men in respect of any sum whatever, there is no reason for disturbing the finding of the referee, that he owed Spratt $1,085.

The rulings of the referee, to which exception was taken, remain to be considered. Objection was taken to proof of

the value of the logs at St. Anthony, upon the alleged ground that all Mendenhall's indebtedness to Spratt arose under the written contract; but this, as appears from what has been already said, is a mistake.

Objection was taken to proof, that Mendenhall paid Spratt, in June, $217 upon his log account, and for his work and labor in the winter of 1870 and 1871. It is true that the question before the referee was, what did Mendenhall owe Spratt on the 26th May? But if he paid him $217 in June for work done before May, that would seem to be at least an admission by him, that he owed him at least that much before May. At any rate, as the referee arrives at the amount due at the time of garnishment upon other testimony altogether, and merely finds that this sum, being part of that amount, cannot be credited to Mendenhall in this suit, it is not perceived how any error in admitting the evidence can have prejudiced the appellant.

It is said, that Spratt should have been allowed to answer the question, which the referee excluded as immaterial, " Did you not send Mendenhall word that the men were ugly, and would detain the logs, unless he paid or agreed to pay them ? "

No reason is suggested why this was not immaterial, and we can discover none.

One Stanchfield, a witness for appellant, on cross-examination testified that " Rush wrote him he had taken a bill of sale of the team and stuff from Spratt, and for me to take charge of it till he came down." " Rush wrote me there was due the men almost $1,300 "

The case finds that " counsel for plaintiffs here moves to strike out all testimony of witness as to the contents of these letters, on the ground that the evidence is secondary, the letters themselves should be produced, or absence accounted for. Objected to by counsel for garnishee, as the evidence has been

admitted without objection. Counsel for plaintiff replies that the evidence so given was not in reference to any question asked by counsel." The motion was granted and exception taken.

We have the same ground for believing that the testimony was admitted without objection as we have for believing that it was volunteered by the witness, viz. : the statement, not controverted, of counsel. Believing both statements to be true, it is impossible to see why the motion to strike out this evidence was not properly made and granted ; especially as the letters themselves would have been only hearsay evidence.

Finally, it is objected that the question of fraud as to creditors of the bill of sale to Rush cannot be raised in this case, as the complaint alleges no such fact ; that, in order to claim this, plaintiffs should have proceeded upon that ground, and given the garnishee notice of such claim, in support of which the appellant refers to *Gen. Stat., ch.* 66, *sec.* 158.

It is a sufficient answer that the referee does not proceed upon any such ground. He finds that Mendenhall had not turned over the property to Spratt ; that it was still his. Spratt's dealings with Rush are therefore altogether beside the case. His bill of sale to him was altogether nugatory and ineffectual to transfer to him any title to the oxen, fraudulent against creditors or otherwise.

But the ground of the objection seems to be a mistake. The statute is, that if any one has property in his possession, which he claims to hold by a title void as against creditors of the defendant, the creditors may garnishee him, though the defendant could not have maintained an action against him for it, provided he proceeds by supplemental complaint against him, etc.

That is, if Mendenhall, having these oxen in his possession, had so claimed to hold them, the plaintiff should have so pro-

ceeded; but this has nothing to do with Rush, who did not have the oxen in his possession, and is not the garnishee.

On this matter of the bill of sale to Rush, testified to by Spratt, though not in evidence any more than that to Mendenhall, to which he also swears, it is to be observed that the cattle and kit being in Mendenhall's possession and control on the 26th May by his agent Dougherty, if they were not his property, they were certainly liable to be attached as Spratt's, unless they belonged to Rush. It was therefore incumbent on Mendenhall to prove that they were not Rush's, in order to discharge himself. No reason can be suggested why, if Spratt's statement is to be taken to prove that he gave a bill of sale, all that he said on the subject, and all his dealings with Rush should not be taken into consideration to determine what the transaction really was, and we think with the respondents that there was no sale of this property to Rush till sometime in June.

If, therefore, the oxen were not Mendenhall's the referee's judgment must still be affirmed.

Judgment appealed from affirmed.